UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| MIKE D. RUSSELL, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| | ) | Case No. 11-cv-7694 |
| v. | ) ) | Judge John W. Darrah |
| SUPERINTENDENT MORECI, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Mike D. Russell, represented by appointed counsel, has brought this action against Defendants, various prison officials at the Cook County Department of Corrections, in their individual capacities pursuant to 42 U.S.C. § 1983, after he was attacked by other inmates while he was a pre-trial detainee. Defendants have moved for summary judgment, and the Motion has been fully briefed.[1] For the reasons discussed below, that Motion is granted in part and denied in part.

### **BACKGROUND**

The following facts are undisputed, except where otherwise noted.[2] Plaintiff has been in

---

[1] The briefs in this matter were very well-written, including the Response by William R. Klein, court-appointed attorney for Plaintiff.

[2] Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and, in the case of any disagreement, to specifically reference the "affidavits, parts of the record, and other supporting materials relied upon." *See also Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). It is not the duty of the district court to scour the record in search of material factual disputes. *Roger Whitmore's Auto. Servs. v. Lake Co., Ill.*, 424 F.3d 659, 664 (7th Cir. 2005).

custody at the Cook County Department of Corrections (the "CCDOC") since June 2008. (Defendants' Rule 56.1 Statement of Uncontested Material Facts ("SOF") ¶ 5.) At the time of the attack at issue, he was 19 years old.

There are two main affiliations of gangs in the CCDOC: the "People," which consists of gangs such as the Vice Lords, Black Stones and Latin Peoples; and the "Folks" or "Folks Nation," which consists of gangs such as the Gangster Disciples (the "GD") and Latin Folks. (Plaintiff's Rule 56.1(b)(3) Statement of Additional Facts ("SAF") ¶ 1.) Plaintiff used to belong to the GD but left that gang while in jail and joined a third, small gang known by the initials "ATG."[3] (SAF ¶ 9.) ATG consists of former members of other gangs. According to Plaintiff, ATG members have disavowed their former gang membership and consider themselves neutral between the People and the Folks. (SAF ¶ 4.) When a former GD member joins ATG, he is subject to retaliation for violating gang rules because the GD members are considered to be members for life. (*Id.* ¶ 7.) In 2010, ATG had approximately twelve members located on the school wing, Tier 2A of the CCDOC, including Plaintiff, until he was transferred out in April 2010. (*Id.* ¶¶ 6, 18.)[4]

It is undisputed that, in the months preceding the attack on Plaintiff, the leaders of Folks/GD alliance had ordered their members to attack ATG members, and that prison officials, including Defendant Superintendent Moreci, were aware of those orders. The CCDOC's Criminal Intelligence Unit ("CIU") prepared several reports from December 2009 through April 2010, stating that the Folks/GD had ordered its members to attack ATG members, describing the

---

[3] The accepted meaning of the acronym ATG is disputed; it has been explained as "Achieve the Goal," "All Things God," or "Against the Grain."

[4] The school wing is a desirable location for most inmates because it is restricted to detainees ages 17 to 20 and because the inmates are allowed to attend school. (SOF ¶ 15.)

animosity and fights between the Folks/GD and the ATG, and remarking that "violence is imminent." (SAF ¶¶ 10-13, 19.) The CIU reports, which were received by Moreci, also reflected that the animosity was not one-sided and that the ATG members bore at least some responsibility for the fights: the April 2010 report stated that "there are ten detainees affiliated with A.T.G. on tier [2A] and they are the catalyst for the problems on the tier." (*Id.*) Likewise, in a March 2010 CIU report, Plaintiff admitted to making metal shanks; he said he was doing so to protect himself because he knew about the GD orders to attack ATG members. According to that report, Plaintiff also stated that he did not know if he was going to be a target of an attack solely because of his affiliation with ATG or of any specific detainees housed on Tier 2A that would want to harm him. (*Id.* ¶ 12.)

On April 27, 2010, Plaintiff and three other members of ATG were transferred off Tier 2A, the school wing, to Tier 1A on Moreci's orders "due to recent incidents and intelligence." (SOF ¶¶ 14, 15, 17; *see also* SAF ¶ 13.) Moreci testified that he had Plaintiff transferred off the school wing because Plaintiff was one of the most violent inmates in the division at the time, had engaged in fighting and gang recruitment, and had not complied with school rules and regulations. (Defs.' Resp. to SAF ¶ 15.) Plaintiff testified in his deposition that, about a week before he was attacked, Moreci was present when two inmates and members of the Latin Folks, Angel Concepcion and Richard Kupfersmith, threatened to kill Plaintiff during a confrontation between a group of school detainees and another detainee group. (SAF ¶ 14.) Another ATG member, William Kaywood, also testified that the ATG members thought Moreci was using them as "bait" for the other gangs by sending them to the Tier 1A decks:

> So Sup Moreci . . . was sending certain guys up . . . . putting us on decks, the decks that stacked with the Gangster Disciples and the Latin Folks . . . using us for bait to see the outcome of what would happen on the decks . . . and see if there was guys – really, these guys got knives up there, soap sock, everything. Once we come on the deck, like in 24 hours, some go at it. We be gonna get stabbed, get jumped on, sent to the hospital.

(SAF ¶ 25.)

Plaintiff also testified that during the April 27, 2010 transfer, he specifically told Defendants Captain Julian and Officer Tate, as well as other officers, that he could not be housed in Tier 1A because his life was in danger, and he identified Kupfersmith and Concepcion to Captain Julian with Officer Tate present. (SAF ¶ 18; *see also* Pl.'s Resp. to SOF ¶ 25.) However, Kaywood, who was transferred at the same time, testified that he did not hear Plaintiff tell Julian or Tate about any specific inmates; rather, Kaywood testified that Plaintiff told Julian he did not want to leave the school wing and told Tate that he did not want to go to Tier 1A because there were Latin Folks up there. (Pl.'s Resp. to SOF ¶ 22.)

Captain Julian testified that he and another officer, Officer Aloisio, offered Plaintiff protective custody on April 27, 2010, but Plaintiff refused. (SOF ¶¶ 32-33). Plaintiff, however, has submitted an affidavit that he was never offered protective custody on that day. (Pl.'s Resp. to SOF ¶¶ 32-33.) He also submitted a CCDOC document "Refusal of Protective Custody," which is signed by Julian as a witness but lacks Plaintiff's signature and states that Plaintiff refused to sign the document. (*Id.* Exh. 1.) While Kaywood also testified that they were not offered protective custody, he gave some conflicting testimony about whether they refused protective custody. (SOF ¶ 37.)

The next day, April 28, 2010, Plaintiff was attacked by members of the Latin Folks gang, stabbed five times, and beaten unconscious, in an "interlock area" between Tiers 1A and 1B.

4

(SAF ¶¶ 22-23.) According to two reports prepared by the CIU, eleven inmates, including Concepcion, had their handcuffs removed while being escorted to the interlock area upon returning from the law library. (*Id.* ¶¶ 21, 23.) Plaintiff was inside the Tier 1A dayroom, standing by the doorway between the interlock and the dayroom, when Kupfersmith popped out of his cell and ran into Plaintiff, pushing him through the 1A doorway. (*Id.* ¶ 23.) Concepcion then pulled Plaintiff into the interlock, where Plaintiff was attacked and stabbed by at least five of the inmates. The stabbing occurred because Thomas allowed unhandcuffed violent gang members, including Concepcion, to return onto Tier 1A. (*Id.* ¶¶ 23-24.)

As reflected by the CIU reports, at this point, there were multiple inmates, none handcuffed, attacking Plaintiff with weapons in the interlock, with only two female officers present. (*Id.*) One CIU report stated that:

> The security problem appears to be the *lack of immediate supervision which allowed the transportation officers to remove the handcuffs from the entire group* of inmates and have them all enter the interlock and congregate at one time.

(*Id.* (emphasis added).) That report further noted that "CIU also related information regarding both Russell and Concepcion to Division 9 staff prior to this incident." (*Id.*) An "All-Available" call was made, and it took officers 1 - 2 minutes to respond and rescue Plaintiff from his attackers. (SOF ¶¶ 59, 61.) Moreci testified that nothing done by the Tier 1A officers on the date of the attack violated standard operating procedures. (Defs' Resp. to SAF ¶ 24.)

As a result of the stabbing, Plaintiff spent several weeks in various hospitals. (SAF ¶ 28.) He told investigators he could not identify his attackers and did not want to prosecute them; he also refused protective custody after he returned from the hospital. (SOF ¶¶ 63, 66.) The grievance he filed with the Cook County Jail (the "CCJ") did not mention either Concepcion or

5

Kupfersmith. (SOF ¶ 82.)

Defendants argue that Plaintiff cannot establish that Defendants had specific knowledge of a substantial risk of serious injury, or even if they did, that their response was reasonable and not deliberately indifferent.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. ESPO Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005)

(citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

*Failure to Exhaust*

Defendants first argue that Plaintiff has timely failed to exhaust his administrative remedies because he filed his grievance more than the 15 days required by the CCJ grievance procedures. However, as Plaintiff correctly points out, his grievance was decided on its merits by the CCJ, and therefore, Defendants cannot rely on this defense. *See, e.g., Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011).

*Failure to Protect*

Defendants next argue that Plaintiff cannot show that they were deliberately indifferent to his safety when they failed to protect him from the April 28, 2010 attack. Under the Fourteenth Amendment, prison officials have a duty to protect pre-trial detainees, like Plaintiff, from violence at the hands of other inmates. *Fisher v. Lovejoy*, 414 F.3d 659, 661 (7th Cir. 2005); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994).[5] "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 833. Rather, the prison official must have acted with "deliberate indifference" to "a substantial risk of serious harm" to the inmate. *Id.* at 834.

---

[5] The Eighth Amendment applies to convicted prisoners and its case-law, such as that found in *Farmer*, is often consulted for the analogous deliberate indifference claims arising under the Due Process Clause. *Fisher*, 414 F.3d at 662n1.

7

A prison official acts with deliberate indifference only when "the official knows of and disregards an excessive risk to inmate health or safety". *Id.* at 838-40. This standard is equivalent to criminal recklessness. *Id.* An official will not be liable if he "responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that [he was] deliberately indifferent." *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007). Thus, to prevail on his claim, Plaintiff must demonstrate that: (1) Defendants were aware of a substantial risk of serious injury and (2) they failed to take appropriate steps to protect him from that danger. *Guzman*, 495 F.3d at 857. With respect to the first element, Plaintiff may show Defendants had actual knowledge by showing either that Plaintiff complained about a specific threat to his safety or by circumstantial evidence of the existence of a risk so substantial that such knowledge can be inferred. *McGill v. Duckworth*, 944 F.2d 344, 349 (7th Cir. 1991); *Fisher*, 414 F.3d at 662.

<u>Superintendent Moreci</u>

In the months immediately preceding the attack, as described more fully above, Superintendent Moreci received several CIU reports that detailed GD/Folks' orders to attack ATG members and stated that Plaintiff had made a weapon to protect himself against such threats. (SAF ¶¶ 10-13, 19.) Moreci was also present when a fight broke out when Plaintiff's life was threatened by the Latin Folks who attacked him a week later. (SAF ¶ 14.) These facts are sufficient to create a genuine issue of material fact as to whether Moreci was aware of a substantial risk of serious harm to Plaintiff and whether Moreci disregarded that risk when Moreci ordered that Plaintiff be transferred off the school wing and into a jail population where

he could be, and was, more easily attacked.  Consequently, summary judgment is denied with respect to Defendant Moreci.

### Captain Julian

With respect to Captain Julian, there is also a genuine issue of material fact as to whether Julian knew of the substantial risk of harm to Plaintiff and whether he disregarded that risk in transferring Plaintiff.  Plaintiff has testified that he specifically told Julian about the threats made to him by two of his attackers, Concepcion and Kupfersmith.  (SAF ¶ 18; *see also* Pl.'s Resp. to SOF ¶ 25.)  Kaywood gave somewhat corroborating testimony that Plaintiff told Julian that he did not want to leave the school wing.  (SOF ¶ 37.)   There is also a disputed issue of fact as to whether Julian offered Plaintiff protective custody.  While Julian contends he did, Plaintiff contends he did not, and the document reflecting the offer is not conclusive either way.  (Pl.'s Resp. to SOF ¶¶ 32-33.)  These are credibility issues that are not properly decided on a motion for summary judgment.  Consequently, summary judgment is denied with respect to Defendant Julian.

### Officer Thomas

With respect to Officer Thomas, Plaintiff claims that, on the day of the attack, he told her that his life was in danger and that some detainees on the deck were trying to kill him; he also believes he identified Kupfersmith and Concepcion to Thomas.  (Pl.'s Resp. to SOF ¶¶ 50, 55; SOF ¶ 47.)  Thomas then permitted a group of inmates, including Concepcion, to return to the deck without their handcuffs, where they then attacked and stabbed Plaintiff.  (SAF ¶¶ 23-24.)  As reflected in the CIU reports, there was a known history between Plaintiff and Concepcion, and permitting the inmates to return unhandcuffed created a security problem, violated common

9

sense, and permitted the violent attack on Plaintiff. (*Id.* ¶ 23.) Consequently, there is a genuine issue of material fact whether Thomas acted with deliberate indifference to Plaintiff's safety. Summary judgment is denied as to Thomas.

<u>Defendants Kelly, Marmol, Martinez, Tate, Rodriguez</u>

With respect to Sergeant Kelly, Sergeant Marmol, Officer Martinez and Officer Rodriguez, Plaintiff has not demonstrated that they knew of and disregarded a specific threat to his safety. It is undisputed that Plaintiff did not inform any of them about the threat to him by specific individuals. Rather, he told them that his "life was in danger" and "do not house me on this tier." (Pl's. Resp. Br. at 5; *see also* Pl.'s Resp. to SOF ¶ 45.) Furthermore, it is undisputed that none of these Defendants were working on the day of the attack.

These types of statements about a general fear of assault are insufficient to be notice of a specific threat. *Guzman*, 495 F.3d at 857. Thus, in *Contreras v. Purtell*, No. 06–C–2156, 2007 WL 4246859, at * 4 (N.D. Ill. Nov. 28, 2007), an inmate plaintiff informed officers that he thought he would be attacked but did not give any details about the threat. The court held that his statement did not provide the officer-defendant with actual knowledge of a specific threat; specifically, the plaintiff did not inform the defendant "who threatened him, the nature of the threat, where and when the threat would be carried out, or how the harm would occur." *Id.* at *3. Consequently, summary judgment is granted in favor of Defendants Kelly, Marmol, Martinez and Rodriquez.

With respect to Officer Tate, Plaintiff does not claim that he told Tate about specific individuals who were going to attack him. (SAF ¶ 18; *see also* Pl.'s Resp. to SOF ¶ 25.) Rather, he makes a vague assertion that Tate was "present" when Plaintiff identified Kupfersmith

and Concepcion to Julian. This, by itself, is insufficient to establish that Tate knew about a specific threat and that she disregarded that risk. *See Guzman*, 495 F.3d at 857; *see also Contreras v. Purtell*, 2007 WL 4246859. Furthermore, when Plaintiff asked Tate to talk to Julian about his transfer, she responded appropriately by contacting Julian; for this reason, she was not deliberately indifferent even if she knew about the specific risk. *See Guzman*, 495 F.3d at 857 (An official will not be liable if he "responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that [he was] deliberately indifferent.") Consequently, summary judgment is granted in favor of Defendant Tate.

## CONCLUSION

For the reasons stated above, Defendants' Motion [66] is granted in part and denied in part. Summary judgment is granted in favor of Defendants Kelly, Marmol, Martinez, Tate, and Rodriguez; those Defendants are dismissed from the case. Summary judgment as to Defendants Moreci, Julian, and Thomas is denied.

Date: October 31, 2013

_____
JOHN W. DARRAH
United States District Court Judge